**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald HOOKER and Donald Ray
Reed, Defendants-Appellants.**

No. 92-7566.

United States Court of Appeals,
Fifth Circuit.

July 26, 1993.

---

DeMOSS, Circuit Judge:

## I. PROCEDURAL HISTORY

Donald Hooker (Hooker) and Donald Ray Reed (Reed) were charged in a six-count indictment with conspiring to distribute crack cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 846 (count 1), aiding and abetting each other in distributing crack cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C) (count 2), carrying and using firearms in the conspiracy in violation of 18 U.S.C. §§ 2 and 924(c) (count 3), and using firearms while kicking and assaulting a state narcotics officer who was acting as a federal officer in violation of 18 U.S.C. §§ 111 and 1114 (count 4). Reed alone was charged with being a convicted felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924 (count 5), and knowingly possessing a firearm with removed or altered serial numbers in violation of 18 U.S.C. §§ 922(k) and 924 (count 6). Both Hooker and Reed were convicted on all of the counts on which they were charged, and they now appeal those convictions.

The defendants contend the district court erred (1) in failing to instruct the jury with regard to a knowledge requirement for Count 6, (2) in failing to dismiss their conviction on Count 4 because there was insufficient proof to establish that a state officer was acting as a federal officer, (3) by improperly applying the Federal Sentencing Guidelines with regard to Count 4, and (4) by allowing the government to introduce evidence of their prior drug related activity when that evidence violated Federal Rules of Evidence 403 and 404(b). We reverse Reed's conviction on Count 6 and affirm all other convictions for both Hooker and Reed.

## II. FACTS

In January 1992, three federal agencies, the Federal Drug Enforcement Administration (DEA), the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Federal Bureau of Investigations (FBI) began an investigation of Reed, which involved allegations of drug trafficking and firearms viola-

Gaines S. Dyer and Rabun Jones, Dyer, Dyer, Dyer & Jones, Greenville, MS, for Hooker and Reed.

John R. Hailman, Robert H. Norman, Asst. U.S. Attys. and Robert Q. Whitwell, U.S. Atty., Oxford, MS, for the U.S.

Before KING, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

tions. The DEA was the lead agency and coordinated the investigation. However, because the DEA had only three officers at its Oxford, Mississippi office, it enlisted the help of the Mississippi Bureau of Narcotics (MBN) and the North Central Mississippi Drug Task Force (Task Force). The agents also obtained the assistance of Kenny Pepper (Pepper), who was an informant who claimed to have previously purchased drugs from Reed and offered to obtain further evidence for the investigation.

On January 29, 1992, nine state and local agents, supervised by DEA agent Arliss Swindoll, met with Pepper and arranged for him to purchase drugs from Reed. The plan was for MBN officer Elbert Craig (Craig) to accompany Pepper and pose as his "Uncle Al." The agents fitted Pepper with a hidden tape recorder and transmitter so that they could later use the taped conversations for evidence.

Around 8:00 p.m. on January 29, Craig and Pepper went to Reed's house in Belzoni, Mississippi. The house was surrounded by a chain link fence containing pit bull dogs and it had security doors at all three entrances. Craig stayed in the car while Pepper approached the house and spoke to Reed. Pepper explained that one of his cousins had referred him to Reed as someone from whom he could purchase drugs. Reed asked Pepper what he wanted. Pepper said a gram, to which Hooker, who was standing nearby, replied "a gram of cain?" Reed said "I really don't deal," and walked outside and down the street where he spoke with someone in a car.

In the meantime, Pepper and Hooker continued talking. When Reed returned to the house, he asked Pepper if Hooker got him the dope. Pepper said no, and Reed then talked privately with Hooker. Shortly thereafter, Hooker asked Pepper how much he wanted. Pepper replied, "a sixteenth to start off." Hooker told Pepper a gram would cost "one hundred forty" and that a sixteenth would cost "one hundred sixty." Hooker and Reed then stepped aside while Pepper observed Hooker remove his baseball cap and

put it back on. Hooker then asked Pepper to walk down the street with him. They walked about a half a block when Hooker removed his cap, took a rock of cocaine out of the band of the cap, and handed it to Pepper. Hooker then motioned for Pepper to put the money in the cap, which he did, and Hooker put the cap back on his head. Pepper told Hooker he would be back the next day for another purchase.

On January 30, 1992, the agents, along with a second DEA agent, met to prepare for a second drug buy from Hooker and Reed. The agents also prepared to execute a search warrant of Reed's house, which they were going to serve after the second buy. Craig and Pepper arrived at Reed's house around noon, whereupon Pepper entered the house and asked Reed for drugs. Reed told him to talk to Hooker, who had agreed to sell him the drugs. Hooker told Pepper he was first going to search him for "wires." Pepper refused and returned to the car and he and Craig drove away.

While riding in the car, Craig told Pepper to remove the recorder and transmitter, which he did, and go back in the house. Craig then drove back to the house. While Craig stayed in the car, Pepper approached the house. Unbeknownst to Craig and Pepper, Hooker and Reed had followed them as they drove around the block. Hooker and Reed arrived at the house just after Pepper and Craig. Hooker approached Pepper from behind and told him to go in the house. Once inside the house, Reed and Hooker asked Pepper if he was "the police." Pepper denied that he was, but Reed left the room and came back holding two guns and ordered Pepper in the bathroom. While Reed held a gun to Pepper's head, Hooker searched him, but found nothing. Reed then told Dalton Handy[1] to bring in "Uncle Al,"[2] which he did.

As Craig prepared to enter the house, he clipped onto his belt a transmitter, which was made to look like a pager, and radioed to the surveillance team that he was going into the

---

1. Dalton Handy was present at Reed's house during the incident. He was indicted on Count 4, but the jury acquitted him.

2. Craig, of course, was Uncle Al.

house. When Craig stepped inside the house, he saw Reed with a gun in his belt and one arm behind his back. Reed pulled the gun from his belt and another from behind his back and told Craig and Pepper that they were not leaving. Reed put a cocked, loaded gun to Craig's forehead and ordered him into the bathroom. In the bathroom, Reed made Craig get on his knees and he put a gun to the back of his head. Reed kicked Craig twice in the ribs with his boot while telling him "if you're the ... police, were gonna kill you."

Hooker went and searched the car and returned with Craig's walkie-talkie, tape recorder, and pistol. Hooker ordered Craig to stand up so he could be searched. Hooker patted Craig down and found Craig's other pistol in an ankle holster. Hooker asked Craig where he got the gun. When he replied on the streets, Hooker said "you're a damn liar.... This is a police gun." Hooker ordered Craig back on his knees and kicked him twice more saying "let me kill him. Let me kill the ... police." Reed told Hooker "not here at my house. Lets take him to the woods." While Hooker pointed a pistol at Craig's skull, Hooker and Reed argued whether they should kill Craig in the woods or at the house.

Meanwhile, unbeknownst to Hooker and Reed, the surveillance team had heard the conversation and were racing to the house. While still on his knees, Craig heard someone rattle the doorknob on the side door. He looked over and saw one of the surveillance team agents looking through a small window by the door. Reed, apparently having heard the agents, suddenly changed his demeanor saying "I'm going to call the Sheriff, ... [and] tell him I've got two men over here at my house with guns." Immediately thereafter, the agents burst into the house and arrested Hooker and Reed.

Later that day, the agents brought a search warrant and searched the house. Their search revealed three sets of scales, which contained cocaine residue, cocaine residue on the kitchen counter and the micro-

wave, inositol and baking soda, which are used to cook powder cocaine into "crack," holsters and ammunition for firearms, a police scanner, a cellular telephone, sandwich bags with the corners cut off, which contained cocaine residue, $1,333 in cash, an identification card with Reed's picture but bearing the name of Luther Howard, a photograph of Reed sitting at a table with large sums of money and a gun in each hand, and a receipt made out to Hooker for $40,850 in cash that had been seized by the Alachua County Sheriff's Office from Hooker and Reed near Gainesville, Florida on December 17, 1991.

## III. DISCUSSION

1. Did the District Court Err in Instructing the Jury as to Count 6?

■ Reed contends that the district court erred in not instructing the jury, as to his conviction under 18 U.S.C. §§ 922(k) and 924, that it had to find that Reed knew the two guns he used against Craig had their serial numbers altered or removed for them to convict him. For support, Reed primarily relies on the language of the statutes, the Ninth Circuit's opinion in *United States v. Sherbondy*,[3] and this court's opinion in *United States v. Anderson*.[4] Section 922(k) provides:

> [i]t shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.[5]

Reed interprets § 922(k) to mean that the word knowingly, in the first part of the provision, modifies both the acts of transporting, shipping, and receiving firearms in interstate or foreign commerce *and* the acts of possessing or receiving any firearms shipped or

---

**3.** 865 F.2d 996, 1001 (9th Cir.1988).

**4.** 885 F.2d 1248 (5th Cir.1989) (*en banc*).

**5.** 18 U.S.C. § 922(k).

transported in interstate or foreign commerce, which are listed in the second part of the provision.

On the other hand, the government argues that the word knowingly modifies only the acts of transporting, shipping, and receiving firearms in interstate or foreign commerce, which are listed in the first part of the provision. In the second part of that section, which prohibits the acts of possessing or receiving firearms that at any time have been shipped or transported in interstate or foreign commerce, the word knowingly is omitted. Therefore, the government argues § 922(k) makes a distinction between firearms being directly transported, shipped, or received in interstate commerce and firearms that have at any time in the past been shipped or transported in interstate commerce, and requires a knowing violation for the former, but not for the later.

In our view, any ambiguity created by the language of § 922(k) is cleared up by § 924(a)(1)(B), which provides the penalty for violations of section 922(k). Section 924(a)(1)(B) applies by its terms only when the defendant "knowingly violates" § 922(k).

In *Sherbondy*[6], the Ninth Circuit held that an analogous statute, 18 U.S.C. § 922(g)(1), requires a knowing violation. Section 922(g)(1) makes it "unlawful for any person who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport any firearm or ammunition in interstate or foreign commerce." Punishment for a violation of § 922(g)(1), like § 922(k), is provided under § 924(a)(1)(B). In *Sherbondy*, the court concluded that "it is highly likely that Congress used section 924(a) simply to avoid having to add 'willful' or 'knowing' into every subsection of section 922. Under section 924(a)(1)(B) we conclude an 'unknowing' act cannot constitute a violation of section

922(g)."[7] The Ninth Circuit's holding in *Sherbondy* supports our conclusion in the present case that the language in the second part of subsection (k), which like subsection (g) does not expressly have a knowledge requirement, still requires a knowing violation because of the knowledge requirement in § 924(a)(1)(B).

In *United States v. Anderson*,[8] we overruled our previous holding in *United States v. Vasquez*[9] by holding that a conviction of possession of unregistered firearms under the National Firearms Act requires the government to prove that the defendant knew the items in question were "firearms" under the Act, not merely that the items in question were "firearms" within the general meaning of the term,[10] even though neither the Act, 26 U.S.C. § 5861(d), nor the penalty provision of the Act, 26 U.S.C. § 5871, required a knowing violation. In *Anderson*, this court concluded that it wanted to move away from the "Circuit precedent permitting conviction of certain felonies without proof of *mens rea*."[11] Since this court required a knowing violation in *Anderson*, which involved a statute silent as to any knowledge requirement, clearly we should require a knowing violation in a statute whose penalty provision expressly requires a knowing violation, such as § 922(k). Therefore, we hold a conviction under § 922(k) requires not only knowing possession of a firearm, but also knowledge that the serial numbers on a firearm have been altered or removed, as of the time of the possession.

The government advances three independent arguments to support upholding the jury charge. First, the government contends that ordinarily a defendant need not know that his act is specifically illegal to commit a knowing violation, so long as the defendant knows factually that he is doing the prohibited act.[12] According to the government, it is illogical and naive to assume that a drug

**6.** 865 F.2d 996 (9th Cir.1988).

**7.** 865 F.2d 996, 1002 (9th Cir.1988).

**8.** 885 F.2d 1248 (5th Cir.1989) (*en banc*).

**9.** 476 F.2d 730 (5th Cir.), *cert. denied*, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973).

**10.** 885 F.2d 1248 (5th Cir.1989).

**11.** 885 F.2d at 1249.

**12.** *U.S. v. Baker*, 807 F.2d 427 (5th Cir.1986).

dealer like Reed was unaware that the serial numbers on his firearms were altered or removed. The government's argument, however, does not address the question whether the statute requires, as a matter of law, that Reed knew the serial numbers had been altered or removed. Instead, its argument addresses the credibility of the witness, which is an issue for the jury and is not relevant to our determination of the requirements of the statute.

Second, the government contends that Reed waived and withdrew his request for an instruction that to convict him the jury was required to find that he knew the serial numbers had been altered or removed. Reed requested and submitted to the district court an instruction, which stated "even if you find beyond a reasonable doubt, that Donald Ray Reed possessed firearms with the serial numbers obliterated ... you may not convict him of this count unless you also find, beyond a reasonable doubt, that he knew at or before his possession of such firearms that these weapons had no serial numbers." To support its conclusion that Reed waived this instruction, the government relies on a colloquy concerning the jury instructions in which one of Reed's attorneys stated to the court, "I think simple possession of [a firearm] is sufficient."

■ The government contends the only fair conclusion to draw from the attorney's statement is that Reed intended to waive and withdraw that instruction. However, Reed's other attorney later in the same colloquy stated, "[y]our Honor, if we could just modify [the instruction] just to make it a little more clear that, when it says 'knowingly' in [the instruction] the way it's written now, it's referring also to the fact [Reed has] to know that it did not have a serial number or an obliterated serial number." The conflicting statements by Reed's two attorneys do not lead us to conclude that Reed waived the instruction. Our conclusion is buttressed by the fact that the district court subsequently went on to refuse the proffered instruction.[13]

Third, the government contends that Reed admitted he knew the serial numbers had been altered or removed, and therefore any error in failing to instruct the jury that to convict Reed it was required to find that he had knowledge that the serial numbers had been altered or removed is harmless. The government points to the testimony of ATF agent Don Medley, who testified that Reed told him after he was arrested that "the two handguns with the serial numbers messed up had been stolen and when they were returned in their presence (sic), they were in their present condition." The government also cites the exchange at trial between the U.S. Attorney and Reed, whereby Reed discussed his theory as to how the serial numbers were removed.[14]

■ The government contends if the facts underlying the instruction are not contested, as it asserts they are here, the instruction is unnecessary and the failure to give it will not be error.[15] From the record, it is difficult for this court to determine whether Reed admitted he knew the guns' serial numbers had been removed so as to dispense with the

---

**13.** The jury charge for Count 6 in part reads as follows:

In order to find the defendant Donald Ray Reed guilty of possessing a firearm with an obliterated or altered serial number, you must be satisfied that the Government has proved each of the following elements: First, that on or about the dates set forth in the indictment, the defendant Donald Ray Reed knowingly possessed at least one of the firearms described in Count 6 of the indictment; second, that the importer's or manufacturer's serial number had been removed, obliterated, or altered; and, third, that said firearm had previously been shipped or transported in interstate commerce, that is, across state lines.

**14.** The exchange went as follows:

U.S. Attorney: You gave those agents an explanation of how those serial numbers got filed off those guns, didn't you?
Reed: No. I gave my theory how they got off. I don't really know how they got off. That was just a thought.
U.S. Attorney: Just a theory?
Reed: Right. It was a thought.
U.S. Attorney: Isn't it a fact that you told them those guns were stolen?
Reed: Right. I told them—
U.S. Attorney: And when they were returned, the serial numbers were missing?
Reed: Yes sir. Which they was.

**15.** *See United States v. Heath,* 978 F.2d 879 (5th Cir.1992).

necessity of an instruction. Reed may have been admitting that he knew the serial numbers were missing before his arrest or he may simply have been admitting that he knew as of the time of trial that they were missing. If it is an admission of his knowledge of the missing serial numbers before his arrest, the court's failure to instruct the jury is probably harmless. If he is admitting his knowledge at the time of trial, however, the admission is meaningless. From our reading of the record and the context in which the statement was made, we can not affirmatively say that Reed admitted that he learned that the serial numbers were missing before his arrest. Given our confusion as to the significance to attach to Reed's statements, we will not hold that his statements rendered the district court's erroneous instruction harmless.

We hold that 18 U.S.C. §§ 922(k) and 924 require a jury to find that a defendant knew the serial numbers had been removed before it can convict him. Since this crucial element was omitted from the jury instruction after Reed requested it, we reverse his conviction as to Count 6.

2. Was Craig a Federal Agent for Purposes of 18 U.S.C. §§ 111 and 1114?

■■■ Hooker and Reed contend that Craig was not a federal agent under the provisions of 18 U.S.C. §§ 111 and 1114, and therefore their convictions must be reversed. Hooker and Reed concede that the operation that led to their arrest was began by the DEA, involved several FBI and ATF agents, was headed by Agent Swindoll of the DEA, and from the beginning was to be prosecuted in federal court. However, Hooker and Reed contend the operation was a "state operation" because it was financed mostly on state and local money and the majority of the officers at the "pre-buy" meeting and the subsequent surveillance operations were state and local officers. Hooker and Reed cite numerous cases holding that a state officer who is assisting a federal investigation is a "federal officer" under §§ 111 and 1114,

and then attempt to distinguish the present case from those cases.

The government points out that the two DEA agents participating in the operation were two-thirds of all the DEA agents assigned to cover the 37 county area encompassing the Northern District of Mississippi. Because it is so short-handed, the government contends the DEA relies heavily on local and state support in almost all of its investigations. Therefore, the government contends the mere fact that the number of state officers involved in the operation outnumbered the number of federal officers is not relevant to Craig's status as a federal agent. The government also relies on the case of *United States v. Williamson*,[16] which takes an expansive view of what a federal agent is for purposes of §§ 111 and 1114.

In *Williamson*, a state narcotics agent was assisting two federal agents in an undercover narcotics investigation. While the state officer tried to arrest the defendant, the defendant attempted to run the officer over with his car. The defendant was prosecuted and convicted for forcibly assaulting a federal officer in violation of § 111. On appeal, the defendant argued that the state officer was not a federal agent, which was required to sustain his conviction. This court disagreed, holding that "since ... [the state officer] was acting in cooperation with and under control of federal officers, in effecting an arrest for violation of the federal drug laws, assault against him was within the coverage of § 111."[17] In the present case, Craig was acting in cooperation with federal officers in a federal operation when he was assaulted. Applying the holding in *Williamson*, Craig easily fits within the coverage of §§ 111 and 1114.

3. Did the District Court Err in Applying the Federal Sentencing Guidelines?

Hooker and Reed contend that the district court erred in two respects in applying the Sentencing Guidelines to their convictions under Count 4 (kicking and assaulting with firearms a state narcotics officer while he

---

16. 482 F.2d 508 (5th Cir.1973).

17. *Id.* at 512. See also *United States v. Chunn*, 347 F.2d 717, 721 (4th Cir.1965); *United States*

*v. Heliczer*, 373 F.2d 241, 249 (2nd Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

was acting as a federal officer). They contend that they were improperly sentenced under Guideline § 2A2.2 and that they were improperly given a three point increase under § 3A1.2.

First, Hooker and Reed argue the district court erred by applying Guideline § 2A2.2,[18] which applies to aggravated assault and provides an offense level of 15, instead of applying Guideline § 2A2.4, which applies to obstructing or impeding officers and provides an offense level of six. Their argument relies on the language of § 2A2.4(b)(1), which provides "[i]f the conduct involved physical contact, or if a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels."[19] Hooker and Reed contend that they should have been sentenced under § 2A2.4(b)(1), instead of § 2A2.2, because they used the firearms solely to threaten Craig.

The commentary to § 2A2.2 provides that " 'aggravated assault' means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm (ie. not merely to frighten), or (b) serious bodily injury, or (c) an intent to commit another felony."[20] In addition, § 2A2.4(c)(1) cross-references § 2A2.2 by providing if "the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."[21]

■ In our view, although there is some overlap between § 2A2.2 and § 2A2.4, the logical conclusion is that § 2A2.4 is meant to apply to possession of weapons and verbal threats, while § 2A2.2 is meant to apply to something more. In the present case, Hooker and Reed's actions in pointing a cocked and loaded firearm at Craig's head, while kicking him and deciding where to kill him, fits within the definition of an "aggravated assault" under § 2A2.2.

In *United States v. Johnson*,[22] the Third Circuit held without discussion that the act of pointing a pistol at the victims' heads while simultaneously threatening to kill them amounted to an aggravated assault under § 2A2.2.

■ A district court's findings of fact for purposes of applying the Sentencing Guidelines are reviewed under the clearly erroneous standard of review.[23] After reviewing the language of the Sentencing Guidelines, the case law, and the record, we hold that Hooker and Reed did commit a "felonious assault that involved a dangerous weapon with intent to do bodily harm";[24] and the district court properly sentenced them under § 2A2.2. For that reason, we find no error committed by the district court on this issue.

■ Second, Hooker and Reed argue that even if they should have been sentenced under § 2A2.2, they should not have been given a three-level increase under § 3A1.2 of the Sentencing Guidelines. Section 3A1.2 provides a 3 level increase if:

(a) the victim was a law enforcement or corrections officer ... and the offense of conviction was motivated by such status; or (b) during the course of the offense or immediate flight therefrom, the defendant ... knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury.[25]

Hooker and Reed contend that they did not know Craig was a law enforcement officer, and therefore his status as an officer could not have motivated them to assault him. However, their contention is belied by the record, which is replete with statements of Hooker and Reed voicing their belief that

**18.** United States Sentencing Commission, *Guidelines Manual*, § 2A2.2 (Nov. 1992).

**19.** *Id.* at 40.

**20.** *Id.* at 39, comment. (n. 1).

**21.** *Id.* at 40.

**22.** 931 F.2d 238 (3rd Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

**23.** *United States v. Mejia–Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989); *United States v. De La Rosa*, 911 F.2d 985, 993 (5th Cir.1990).

**24.** United States Sentencing Commission, *Guidelines Manual*, § 2A2.2 (Nov. 1992) n. 1(a).

**25.** *Id.* at 239.

Craig was a law enforcement officer. For example, Hooker told Reed, "[t]hey are the police. Let's kill them." Hooker also told Reed, "[l]et me kill him. Let me kill the ... police." Those statements are sufficient to show that Hooker and Reed knew Craig was a law enforcement officer, and that his status as a law enforcement officer motivated them to assault him. We therefore defer to the district court's finding that Hooker and Reed were motivated to assault Craig by his status as a law enforcement officer.

4. Did the District Court Err in Admitting Evidence of Hooker and Reed's Prior Drug Related Activity?

Hooker and Reed contend that the district court violated Federal Rules of Evidence 404(b) [26] and 403 [27] by allowing into evidence: the testimony by Pepper that he had purchased cocaine from Reed in the past and that he had seen Reed deliver cocaine to a cousin of Reed; a bag of large-denomination money wrappers; a photograph of Reed, which was hanging on his wall, depicting him with a gun in each hand seated before a table with a large sum of money; and a receipt from the Gainesville, Florida Sheriff's office for $40,850 in cash that had been seized from Hooker and Reed.

■ In *United States v. Beechum*,[28] this court established a two-part test for the admissibility of evidence of extrinsic acts under Rule 404(b). To be admissible, this court held the evidence must be relevant to an issue other than the defendant's character, and the probative value of the evidence must

not be substantially outweighed by unfair prejudice.[29] We review the district court's ruling for an abuse of discretion.

■ Reed and Hooker contend that Pepper's testimony that he had bought drugs from Reed in the summer of 1990 was inadmissible extrinsic act evidence. We disagree. Evidence showing involvement in prior drug related activity is admissible under Rule 404(b) as evidence of knowing participation in a conspiracy.[30] In the present case, Pepper's testimony of the prior dealings was admissible to show Reed's and Hooker's specific intent and knowing involvement in the conspiracy to distribute drugs and to rebut their defense of entrapment, especially since Reed and Hooker argued strenuously at trial that they had been entrapped and even requested an entrapment instruction. Even if we were to assume the admission of the testimony was error, it was harmless and did not affect "a substantial right of the party."[31] Pepper's testimony that he had purchased drugs from Reed in the summer of 1990, a time when Reed was in prison on an unrelated charge, was helpful to the defense, not prejudicial, in that it allowed the defense to impeach Pepper and call into question his credibility regarding other testimony.[32]

■ Hooker and Reed also contend that the admission of the money wrappers, the cash receipt, and the photograph was error because it showed that they engaged in large scale drug operations when they were only indicted and on trial for a small drug sale. Hooker and Reed rely on *United States v.*

**26.** Rule 404(b) states:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.... Federal Rule of Evidence 404(b).

**27.** Rule 403 states:

although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid-

erations of undue delay, waste of time, or needless presentation of cumulative evidence. Federal Rule of Evidence 403.

**28.** 582 F.2d 898, 911 (5th Cir.1978) (*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

**29.** *Id.* at 911.

**30.** *United States v. Wood*, 924 F.2d 399, 401 (1st Cir.1991).

**31.** Fed.R.Crim.P. 52(a).

**32.** *See United States v. Gonzales–Lira*, 936 F.2d 184, 191 (5th Cir.1991).

*Chagra*[33] by claiming that, unlike in *Chagra*, there is no evidence in the present case that defendants were engaged in a " . . . large scale continuing narcotics enterprise so as to justify . . . the admission of large sums of money,"[34] and that *Chagra* allows the evidence of ill-gotten gains to be admitted only if shown to occur "at or after the time of the commission of the alleged offense."[35]

The government contends that the evidence was admissible and also relies on *Chagra*. In *Chagra*, this court held that it was not error for the district court to allow into evidence a purchase by the defendant, who was charged with drug crimes, of two expensive residential properties. In allowing the admission of the evidence, this court held:

> there was sufficient evidence that appellant was engaged in a large-scale continuing narcotics enterprise so as to justify . . . the admission as relevant and probative evidence of his receipt of large sums of money. That the funds for these acquisitions may have stemmed from entirely lawful activities . . . goes to the weight of the evidence rather than to its admissibility.[36]

In the present case, there is sufficient evidence that Hooker and Reed were involved in a drug selling enterprise.[37] In addition, we do not interpret *Chagra* to mean that the evidence of ill-gotten gains need be shown to have occurred at exactly the time of the crime or after but, rather, near enough to the time of the crime for a jury to reasonably infer a relationship between the ill-gotten gains and the criminal conduct. In the present case, the time between the commission of the crimes and the discovery of the money wrappers, cash receipt, and photograph is sufficiently close to meet the *Chagra* requirement.[38]

■ Hooker and Reed next contend that the district court erred in failing to make detailed findings under Rule 403 as to how it balanced the probative value of the evidence against its prejudicial effect. This court has held that such detailed findings are not required if "the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling."[39] In the present case, those requirements are met.

In sum, the district court did not abuse its discretion by admitting into evidence Pepper's testimony, the money wrappers, the cash receipt, and the photograph in that they were relevant to issues other than Hooker and Reed's character, and that the probative value of the evidence was not outweighed by its unfair prejudice.

## IV. CONCLUSION

We find that 18 U.S.C. §§ 922(k) and 924 read in conjunction required Reed to have had knowledge at the relevant time that the serial number had been altered or removed, and consequently the district court erred in not giving an instruction to that effect. We therefore reverse Reed's guilty verdict on Count 6. For purposes of Hooker and Reed's convictions under 18 U.S.C. §§ 111

---

33. 669 F.2d 241 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

34. *Id.* at 256.

35. *Id.*

36. *Id.* at 256.

37. The search of Reed's house revealed three sets of scales that contained cocaine residue, cocaine residue on the kitchen counter and the microwave, inositol and baking soda, which are used to cook powder cocaine into "crack," holsters and ammunition for the guns, a police scanner, a cellular telephone, sandwich bags with the corners cut off, which contained cocaine residue, $1,333 in cash, and an identification card with Reed's picture but bearing the name of Luther Howard.

38. The evidence was also necessary to rebut Hooker and Reed's defense of entrapment, and the claim that Reed only had the guns temporarily and for self-defense. And it also showed Hooker and Reed's motive and intent (to protect their drug operation and its large profits) in assaulting Craig. This evidence was necessary to explain to the jury the reason why Hooker and Reed decided to kill Craig since Hooker and Reed claimed at trial that they would not have tried to kill Craig, if they would have known that he was a police officer.

39. *See United States v. Robinson,* 700 F.2d 205, 213 (5th Cir.1983).

78

and 1114, we hold that officer Craig was a federal agent. We also hold that Hooker and Reed were properly sentenced for aggravated assault under § 2A2.2 and properly given a 3 level increase under § 3A1.2. And, we hold that the district court did not abuse its discretion in allowing the admission of evidence of Hooker and Reed's prior drug related activity. We therefore affirm the verdict on all other counts for both Hooker and Reed.

For the foregoing reasons, we REVERSE in part and AFFIRM in part.