**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0631n.06

**No. 19-4038**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 05, 2020
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR |
| | ) THE NORTHERN DISTRICT OF |
| MALACHI SCURRY, | ) OHIO |
| | ) |
| Defendant-Appellant. | ) OPINION |
| | ) |

---

**Before: BOGGS, STRANCH, and THAPAR, Circuit Judges.**

STRANCH, J., delivered the opinion of the court in which BOGGS and THAPAR, JJ., joined. THAPAR, J. (pg. 17), delivered a separate concurring opinion.

**JANE B. STRANCH, Circuit Judge.** Malachi Scurry was sentenced to 96 months in prison after pleading guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and being convicted by a jury of assaulting, resisting, or impeding an officer designated by 18 U.S.C. § 1114, in violation of 18 U.S.C. § 111(a)(1). He now challenges the legal basis for his conviction and the reasonableness of his sentence. For the following reasons, we **AFFIRM** Scurry's conviction and sentence.

**I.    BACKGROUND**

**A.    Facts**

The facts set forth in this section, which Scurry does not dispute, are derived from the presentence report (PSR) and the testimony adduced at trial.

In the summer of 2018, Scurry was twenty-one years old and living in Akron, Ohio. He was under the supervision of the Ohio Adult Parole Authority following his release from custody on a prior felony conviction. John Christie was an officer with the Ohio Adult Parole Authority assigned to a task force with the Bureau of Alcohol, Tobacco, and Firearms (ATF). That task force worked closely with the Akron Police Department's Gun Violence Reduction Tactical Unit and Uniformed Narcotics Unit, often executing targeted enforcement operations. During such operations, undercover units set up surveillance based on intelligence about illegal possession of firearms, then radio marked patrol units to conduct traffic stops to advance the investigation. Because ATF did not have its own patrol cars—only undercover units—Akron police officers typically conducted the necessary traffic stops and law enforcement encounters so that the subjects could identify the officers as members of the police.

In August 2018 and January 2019, Christie learned that Scurry had posted multiple Facebook videos depicting himself in possession of firearms. Christie contacted Akron Police Department Detective James Alexander, a member of the Gun Violence Reduction Tactical Unit, and several other ATF special agents to open an investigation into Scurry. At the time, Alexander had no prior knowledge of Scurry and was not investigating him. Christie asked Alexander to obtain a search warrant for Scurry's residence and e-mailed Alexander the facts providing probable cause for the search. Alexander copied that information into a search warrant application and without adding any additional information, submitted it to the Akron Municipal Court. He obtained a search warrant that evening.

Christie then formulated an "ATF operation plan," a printed document that provides information on the target of the operation, including a photo of the target; sets forth the Department of Justice Use of Force Policy; and lists the officers and agencies participating in the operation and

their individual roles. The team—made up of ATF agents along with Akron police officers from the Gun Violence Reduction Tactical Unit and the Uniformed Narcotics Division—then convened at the ATF task force headquarters in Akron. Alexander briefed the team because he was familiar with the Akron Police officers; Christie observed to ensure Alexander's briefing was correct and distributed copies of the plan.

Following the plan, the officers set up surveillance of the address on Juneau Avenue where they suspected Scurry was staying, intending to conduct a traffic stop once Scurry left in order to simultaneously search the residence pursuant to the warrant obtained by Detective Alexander. That night, however, Scurry did not leave the residence, and the plan was called off.

The next day, Christie modified the operational plan and held another briefing. At Christie's request, another Ohio parole officer set up a meeting with Scurry later that day at a residence on Jason Avenue, where Scurry claimed to be living. Once Scurry left for the meeting, Akron Police officers were to conduct a traffic stop on his vehicle and other officers would execute the search warrant. This time, Christie also instructed the police officers to take Scurry into custody on a parole violation. To authorize such an arrest, Christie completed a "parole violation hold and parole violation arrest order." Christie characterized the parole order as "a tool" that the team was using to apprehend Scurry.

Executing the modified plan, ATF special agents and unmarked Akron Police units set up surveillance at both the Jason Avenue and Juneau Avenue addresses. That afternoon, Scurry left the Jason Avenue address riding in the passenger seat of an SUV. The undercover team radioed this information, and Alexander and another officer, Sergeant Patrick Dugan, began following Scurry's vehicle and pulled him over. Christie was not present.

Approaching the driver's side of the vehicle, Dugan called out that he could see a gun.

Alexander then attempted to open the passenger side door to remove Scurry from the vehicle, informing him that he was under arrest. Scurry refused to get out of the car and a struggle ensued. Finally, Alexander was able to pull Scurry out, pin him to the ground, and handcuff his wrists behind his back. Scurry turned out to have a loaded and cocked Glock 23 pistol on his person.

After Scurry was taken into custody, Christie and ATF Special Agent Clay McCausland led a search of the Juneau Avenue residence and recovered multiple firearms, magazines, ammunition, and a bulletproof vest. Scurry was then taken to the Akron Police station and interviewed by Christie and McCausland. He admitted that he owned the firearms found in his bedroom.

### B. Case History

On March 6, 2019, the Government filed a grand jury indictment against Scurry that charged him with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); one count of assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111(a)(1); and one count of possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Because the term "federal officer" as used in 18 U.S.C. § 111(a)(1) encompasses a person who is "assisting" an officer or employee of the United States, *see* 18 U.S.C. § 1114, Count 2 of the indictment alleged that violation as to Detective Alexander, "who was engaged in the performance of his official duties assisting an officer and employee of the United States while engaged in and on account of official duties as a federal law enforcement officer."

Scurry moved to dismiss Counts 2 and 3 of the indictment, arguing that Detective Alexander was not a protected "federal officer" under 18 U.S.C. § 111(a)(1) because he was "working in his official capacity as a detective for the Akron Police Department, enforcing state

law violations," and "was not contemporaneously assisting a federal agent in the scope of his official duties." At the final pretrial hearing on May 7, 2019, the district court denied the motion because Scurry's arguments on Count 2 raised factual issues for determination by the jury. Scurry's attorney of record withdrew from the action and was replaced by new counsel on May 10, 2019. A few weeks later, and a week before trial, Scurry pled guilty without a plea agreement to Count 1 of the indictment.

The parties submitted proposed jury instructions, and both parties agreed that the jury should be instructed that a federal officer included a task force officer with the ATF, but disagreed on how "federal officer" should be defined. Scurry proposed to instruct the jury that "[a] federal officer . . . includes a state law enforcement officer acting in cooperation with and under the control of federal officers in a matter involving the enforcement of federal laws." The Government proposed that "[a] federal officer . . . includes a state law enforcement officer assisting a federal officer in the performance of his official duties," including providing "actual physical assistance" while the officer is "in the act of performing his . . . official duties."

At the trial on Counts 2 and 3, before the Government put on its case, the district court read to the jury a short-form instruction, explaining in relevant part that one of the elements of Count 2 was that Detective Alexander qualify as a "federal officer." The district court did not provide a more specific definition of the term "federal officer."

At the close of the Government's evidence, Scurry moved for a judgment of acquittal on both counts; on Count 2, he argued that the evidence was insufficient to establish that when Scurry resisted arrest, Detective Alexander had been "assisting a federal officer in pursuit of his duties." The district court denied Scurry's motion in full, and Scurry did not testify or put on any evidence.

The district court then read the full jury charge, reiterating that to satisfy the first element of Count 2, the Government was required to prove that Alexander was a federal officer, then providing the following definition of a "federal officer":

> A federal officer includes a task force officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives. A federal officer also includes a state law enforcement assisting a federal officer in the performance of his or her duties. To assist means to provide supplemental help or support in carrying out . . . some task of mutual involvement. It is for you to determine if Detective Alexander was assisting the federal officer.

The jury convicted Scurry on Count 2 and acquitted him on Count 3.

### C. Sentencing

Scurry's presentence report (PSR) assigned him a total offense level of 22 and a criminal history category of IV because he had two prior adult felony convictions, one for felonious assault and one for having weapons under disability and resisting arrest. Based on these scores, the PSR recommended a Guidelines range of 63 to 78 months in prison.

At sentencing, Scurry's sole objection to the PSR rested on its failure to provide him with acceptance of responsibility credit even though he had pled guilty to Count 1. Scurry's counsel also presented mitigating evidence and requested a within-Guidelines sentence. The Government sought a sentence of 120 months in prison based on Scurry's conviction; the circumstances of the offense; and his criminal history, including two prior juvenile adjudications after the age of 17 and the two adult convictions. The Government also submitted 21 pages of Scurry's social media activity and played two Facebook videos at the sentencing hearing, all of which featured or referenced firearms. The audio in these videos was not transcribed by the court reporter and the videos were not entered into the record.

The district court overruled Scurry's objection to the PSR and sentenced Scurry to 96 months in prison, reasoning that Scurry was an "extremely dangerous individual" who needed to

be "incarcerat[ed] . . . for a long, long period of time" to deter him from future gun-related crime and to protect others.

Scurry now appeals his conviction on Count 2 and the reasonableness of his sentence.

## II. ANALYSIS

### A. Scurry's Conviction on Count 2

Citing evidence adduced at trial—but conceding that no operative facts are in dispute—Scurry argues that Alexander was not "assisting" a federal agent in the scope of the agent's official duties. Instead, he argues, Alexander was "conducting a state operation contemplated through state judiciary authorization"; he was not supervised by the ATF, was not contracted by the ATF, and was not accompanied by any federal officers at the scene of Scurry's arrest. So although Scurry purports to appeal the district court's denial of his pretrial motion to dismiss, in fact he challenges his conviction on Count 2 on a theory that the proof developed at trial was insufficient *at law* to support the jury's verdict. Put differently, the question is whether the phrase "assisting" an "officer or employee of the United States" or its agencies, as used in 18 U.S.C. § 1114, encompasses Alexander's conduct as established at trial. This is a question of statutory interpretation, which we review de novo. *See U.S. v. Lively*, 852 F.3d 549, 558 (6th Cir. 2017). Our starting point is the language of the statute. *See Hale v. Johnson*, 845 F.3d 224, 227 (6th Cir. 2016). "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

Section 111(a) applies to "whoever [] forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in

or on account of the performance of official duties."  18 U.S.C. § 111(a)(1).  In turn, those

designated in § 1114 include:

> any officer or employee of the United States or of any agency in any branch of the
> United States Government (including any member of the uniformed services) while
> such officer or employee is engaged in or on account of the performance of official
> duties, or any person assisting such an officer or employee in the performance of
> such duties or on account of that assistance . . . .

18 U.S.C. § 1114.

As we have previously held, the word "assist" as used in § 1114 has an "unambiguous,

coherent" plain meaning that is "consistent with the broader statutory scheme," and should be

"enforce[d] . . . according to its terms."  *U.S. v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019)

(quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)).  Looking to Merriam-Webster's online

dictionary, we concluded in *Bedford* that the ordinary meaning of "assist" is "to give usually

supplementary support or aid to" or "to give support or aid."  *Id.* at 427–28 (citation omitted); *see*

*also Assist*, Merriam-Webster, http://merriam-webster.com/dictionary/assist (last visited Nov. 2,

2020)); *see also Assist*, The American Heritage Dictionary of the English Language,

ahdictionary.com/word/search.html?q=assist (last visited November 2, 2020) (defining assist as

"[t]o give help or support to, especially as a subordinate or supplement; aid").  Applying that

definition, we found that a private truck driver contracted to deliver mail for the United States

Postal Service (USPS) was assisting an officer or employee of the United States because he

"provided 'supplemental help or support' to the USPS, an agency of the federal government, in a

task of 'mutual involvement.'"  *Bedford*, 914 F.3d at 428 (quoting *United States v. Reed*, 375 F.3d

340, 344 (5th Cir. 2004)).

Here, too, the evidence presented at trial demonstrates that Alexander provided

"supplemental help or support" to Christie—undisputedly a federal officer—and the ATF task

force in a task of "mutual involvement."  *Id.* (quoting *Reed*, 375 F.3d at 244).  Christie, in his

capacity as a task force officer, received information about Scurry and asked Alexander to help conduct an investigation. Christie asked Alexander to obtain a search warrant, providing him with all the information necessary to do so; Christie also issued the parole arrest order granting Alexander arrest authority and developed the operational plan, which specified the roles of all participants and established the use of force policy that would govern the operation. Alexander stopped and arrested Scurry pursuant to that plan, facilitating the ATF task force's investigation and leading to the federal indictment in this case.

Scurry seeks to assess Alexander's actions at the moment he arrested Scurry in isolation. He argues that because Alexander was a *state* officer enforcing a *state* parole warrant to safely execute a search warrant issued by a *state* court, he cannot have been "assisting" a federal officer. That Alexander's authority came from state law does not mean he was not assisting the federal investigation. And Scurry offers no authority for the proposition that § 1114 requires a person to assist a federal officer exclusively pursuant to federal authority or exclusively to advance a federal interest.

Scurry also argues that because no federal officers were on the scene of the arrest, Alexander was not under the direct supervision of a federal agency, and was not under contract to the ATF, Alexander was not assisting Christie or the ATF. This theory is foreclosed by *Bedford*, where we explicitly rejected the argument that a driver was not assisting the USPS because "'there was no direct federal participation on the date in question' . . . and [the driver] was not acting upon 'orders or instruction from anyone at the USPS.'" 914 F.3d at 428 (quoting defendant's brief); *see also United States v. Jacquez-Beltran*, 326 F.3d 661, 663 (5th Cir. 2003) (declining to "add to the statutory elements by requiring that a federal agent be physically present with the victim at the time of the assault"). We did, as Scurry points out, find it significant that the truck driver had been

formally contracted by the USPS to carry mail and cited cases from other circuits finding that similar relationships constituted "assisting." *See Bedford*, 914 F.3d at 428–30. But neither the statute nor that opinion suggests that such a contract is a necessary condition to be a designated person under § 1114.

Our application of § 1114 here also comports with the history and purpose of the statutory scheme. *See Hale*, 845 F.3d at 227. In *United States v. Feola*, 420 U.S. 671 (1975), the Supreme Court explained that § 111 was intended to make prosecution for assaults on federal officers cognizable in the federal courts to protect both "federal officers" and "federal functions." *Id* at 679. And in passing § 111 and § 1114's antecedent statute, Congress was "concerned with the safety of federal officers insofar as it was tied to the efficacy of law enforcement activities." *Id.* at 681. "While *Feola* came before the current version of § 1114 was incorporated into § 111, recent opinions have echoed the Supreme Court's earlier sentiment and applied a federal-functions approach to § 111." *Bedford*, 914 F.3d at 429–30 (citing cases). Prosecuting offenses like Scurry's protects both federal officers and federal functions because Alexander's participation was a key component of the ATF task force's plan. Alexander testified that the traffic stop and arrest were executed to ensure that Scurry was not in the residence so the ATF agents could safely search it for firearms. And as Christie testified, the ATF task force did not have its own marked units and depended on the Akron police for law enforcement encounters like traffic stops.

Our sister circuits have come to similar conclusions. In *United States v. Hooker*, 997 F.2d 67 (5th Cir. 1993), for example, an officer of the Mississippi Bureau of Narcotics was assaulted during a drug buy conducted as part of a joint investigation of three federal agencies that was headed by the Federal Drug Enforcement Agency (DEA). *Id.* at 69–70. No federal officers were present at the drug buy when the state officer was assaulted, and the government argued that

"[b]ecause it [was] so short-handed [in the region] . . . the DEA relie[d] heavily on local and state support in almost all of its investigations." *See id.* at 70–71, 74. The operation was financed primarily with state and local funds and the officers who implemented the operation on the ground—by executing a pre-buy meeting and conducting surveillance during the buy itself—were primarily state and local officers. *Id.* at 74. The Fifth Circuit held that the state officer was covered by § 111 and § 1114 because he "was acting in cooperation with federal officers in a federal operation." *Id.*; *see also United States v. Chunn*, 347 F.2d 717, 720 (4th Cir. 1965) (holding that employee of the state of North Carolina who was assaulted while on loan to the Internal Revenue Service as an undercover agent was protected by § 1114).

Accordingly, when he was arresting Scurry, Alexander was "assisting" a federal officer under § 1114. We therefore affirm Scurry's conviction.

**B.    Scurry's Sentence**

Criminal sentences must be both procedurally and substantively reasonable. *Gall v. United States,* 552 U.S. 38, 51 (2007). Scurry principally challenges the substantive reasonableness of his sentence, but his argument that the district court unfairly rejected his request for an acceptance of responsibility credit raises a challenge to the procedural reasonableness of his sentence. We typically review such challenges under an abuse-of-discretion standard. *Id.* at 41.

1.    Procedural Reasonableness

A sentence is procedurally unreasonable if the district court committed a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. Scurry contends that the district court erred in rejecting his request for an acceptance

of responsibility credit because he made a full confession to law enforcement shortly after his arrest, was appointed new counsel only a month before trial and could not have pled guilty on Count 1 any earlier, and proceeded to trial on the remaining counts based only on his challenges to the applicability of § 1114 and § 924(c).

If a defendant "clearly demonstrates acceptance of responsibility for his offense," his offense level should be decreased two levels. USSG § 3E1.1. A sentencing court's factual determination that a defendant has not accepted responsibility "is entitled to great deference," USSG § 3E1.1, comment. (n.5), and we review it for clear error, *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013). *See also United States v. Bolden*, 479 F.3d 455, 464 (6th Cir. 2007) (describing our scope of review as deferential because "§ 3E1.1 determinations involve an overall legal decision that is fact-bound, the district court has comparatively great expertise, and the value of uniform court of appeals precedent is limited").

In rejecting Scurry's request for an offense level reduction under § 3E1, the district court acknowledged that he had pled guilty on Count 1, but took issue with the plea's "timeliness" and Scurry's decision to go to trial on Count 2.

A district court may consider the timeliness of a defendant's acceptance of responsibility to the extent it reflects the defendant's sincerity. *United States v. Hollis*, 823 F.3d 1045, 1047 (6th Cir. 2016); USSG § 3E1.1, comment. (n.1). There is no indication here that the district court considered timeliness for an impermissible reason. *See, e.g.*, *Hollis*, 823 F.3d at 1048 ("Waste of government resources may not be considered under § 3E1.1(a)."). And although trial counsel was appointed on May 10, a month before trial, Scurry had prior counsel and offers no reason why he could not have entered his plea then.

With respect to Count 2, Scurry argues that he only proceeded to trial because he believed the statutes were inapplicable as a matter of law. Acceptance of responsibility adjustments are available to defendants who exercise their right to go to trial to "preserve issues that do not relate to factual guilt," such as "the applicability of a statute to his conduct." USSG § 3E1.1, comment. (n.2). But the record here indicates that Scurry did dispute the relevant conduct, not just the applicability of the statute. Scurry maintained throughout trial that he did not resist arrest. In his closing statement, for example, Scurry's counsel contended that Scurry "did not forcibly assault, resist or oppose" arrest, but rather that he closed the car door so Alexander could not enter and "simply [sat] there . . . doing nothing."

"[A] defendant must accept responsibility for all counts before he is entitled to a reduction in sentence for acceptance of responsibility." *United States v. Chambers*, 195 F.3d 274, 278 (6th Cir. 1999) (affirming a district court's denial of the reduction where the defendant admitted to being a felon in possession but denied his guilt as to another offense). Because Scurry did not do so, the district court appropriately denied his request for a § 3E1.1 reduction. *See id.*; *United States v. Austin*, 797 F. App'x 233, 246 (6th Cir. 2019) (affirming district court's denial of reduction where defendant's "assertions of innocence were not simply, as appellate counsel now claims, legal arguments challenging the applicability of the conspiracy statute to the defendant's conduct," but were actually "deni[als] that he had committed a key element of the conspiracy charge"). Accordingly, the district court did not abuse its discretion in declining to award an acceptance of responsibility credit.

### 2. Substantive Reasonableness

The substantive reasonableness inquiry determines if the length of a sentence conforms with the sentencing goals set forth in 18 U.S.C. § 3553(a) and asks whether the district judge

"'abused his discretion in determining that the § 3553(a) factors supported' the sentence imposed." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (quoting *Gall*, 552 U.S. at 56). This is a separate inquiry from procedural reasonableness: even if the district court followed proper procedures and considered the appropriate factors, we ask whether the district court imposed a sentence that was "greater than necessary." *Id.* at 766–67.

To gauge the substantive reasonableness of a sentence, we may ask whether reasonable weight was given to each sentencing factor. *United States v. Boucher*, 937 F.3d 702, 707 (6th Cir. 2019). When "the court place[s] too much weight on some of the § 3553(a) factors and too little on others" in reaching its sentencing decision, the sentence that results is substantively unreasonable. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019) (quoting *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018)); *Boucher*, 937 F.3d at 707.

Sentences within a defendant's Guidelines range are presumptively reasonable. *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010); *see also Kimbrough v. United States*, 552 U.S. 85, 109 (2007) ("[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). But when the district court varies upward or downward from the Guidelines range, it must ensure its justification is "sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "A district court may vary outside the Guidelines range if it explains how the present case is different from the typical or mine-run case that occupies 'the heartland' to which the Commission intends individual Guidelines to apply." *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020) (quoting *Kimbrough*, 552 U.S. at 109).

Scurry argues that the district court placed too much weight on his criminal history and perceived dangerousness, failed to explain why his case deviated from an ordinary Guidelines case, and was "inflamed" by the Facebook videos played by the Government.

In imposing sentence, the district court explained that it believed Scurry was a "dangerous individual" who posed a risk to the community, distinguishing his case from "mere possession of firearms" or "merely resisting an officer." The court addressed the "dangerous" circumstances of Scurry's offense—that he resisted arrest while armed with a loaded pistol. Scurry also had a history of prior criminal conduct that had escalated in seriousness over time, including three juvenile adjudications, two felony convictions as an adult for offenses involving firearms, and one prior parole violation. He had also reportedly resisted the marshals' attempts to bring him to court on at least one occasion. The district court concluded that Scurry was willing to use a gun to harm others, as evidenced by social media posts and videos that depicted him using firearms and apparently making threats. Although the Facebook videos should have been entered into the record for appellate review, the record and the court described them adequately for us to conclude that the court did not abuse its discretion in considering them.

The district court adequately explained its concern that Scurry "still doesn't get it" and was "a dangerous individual" who was "on the path to shooting somebody." And on these facts, the court's conclusion that Scurry posed an ongoing risk of harm to himself, the community, and law enforcement, was reasonable and distinguishable from mere speculation "that an individual will cause some particular harm at a future point in time." *United States v. Tristan-Madrigal*, 601 F.3d 629, 635 (6th Cir. 2010). Finally, because Scurry's mitigating characteristics did not demonstrate that he "ha[d] any insight or any willingness to change his ways," the court explained that a "long

sentence [was] necessary."  It did, however, discount the Government's proposal by 24 months in light of Scurry's youth.

Whether another judge might have found a different sentence appropriate is not the point. The district court reasonably balanced the relevant factors and presented a sufficiently compelling justification for treating Scurry's case differently from a "heartland" case.  *Kimbrough*, 552 U.S. at 109.  Its decision to assign greater weight to the interests of protecting the public and providing adequate deterrence, and less weight to Scurry's mitigating characteristics, was within its discretion.  Scurry's sentence must be affirmed.

## III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** Scurry's conviction on Count 2 and **AFFIRM** his sentence.

THAPAR, Circuit Judge, concurring.  I join the majority opinion in full, except to the extent it relies on statutory purpose.  As the majority acknowledges, the text of the statutes is clear, so resort to statutory purpose is improper.