UNITED STATES of America,
Plaintiff,

v.

Owen LUMA and Troy Nesbitt,
Defendants.

No. CR.2000–14.

District Court, Virgin Islands,
D. St. Croix.

April 26, 2002.

Tracey Christopher, SAUSA, for U.S.

Wilfredo Geigel, Christiansted, VI, for Luma.

Martial Webster, VI, for Nesbitt.

### MEMORANDUM OPINION

FINCH, Chief Judge.

On March 22, 2001, the jury found Defendants Owen Luma and Troy Nesbitt guilty of possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Nesbitt was also found guilty of being a convicted felon in possession of a firearm in violation of 18 U.S.C.

§ 922(g) and Luma was found guilty of offering prostitution in violation of 14 V.I.C. § 1622(6). The Court has before it Defendants' motions for acquittal on all charges and for new trials. The Court finds that Counts I and II of the Indictment are defective and dismisses them and denies Defendants' motions on the remaining counts.

## I. The Evidence Against the Defendants

The government's documented confidential source, John Sauer, testified that shortly after becoming acquainted with Luma, Luma gave him a business card advertising prostitution. Tr. III, p. 90, 1.15—p.91, 1.25. According to Sauer, Luma told him that he had about 12 girls working for him and gave Sauer the prices for their services. *Id.*, p. 90, 1.2–19. Luma also offered Sauer guns and drugs. *Id.*, p. 93, 1.2—p.94, 1.2. Sauer stated that Luma offered him an AK–47, Mac–11, a Glock and hand grenades. *Id.*, p. 100, 1.1–6. Sauer indicated that Luma described to him a method to divide crack cocaine for resale. *Id.*, p. 100, 1.14—p.101, 1.10.

Sauer arranged to buy a quantity of crack cocaine from Luma for $125 and a Mac–11 gun for $900. *Id.*, p. 103, 1.19—p.104, 1.14. Luma agreed to meet with Sauer where Luma worked as a security guard on the night of November 8, 2000 to make the exchange, but Luma did not keep this appointment. *Id.*, p. 104, 1.16—p.105, 1.15. In a recorded conversation that evening, at Luma's insistence, Luma and Sauer rescheduled for the following morning of November 9, 2000. *Id.*, p. 105, 1.6—p. 106, 1.25.

On the morning of November 9, 2000, Sauer arrived at the designated location near the guard shack and opened his trunk. *Id.*, p. 113, 1.3–6. Luma was parked a distance down a hill, near some bushes. *Id.*, p. 113, 1.9–15. When Sauer refused to go down the hill to Luma, Luma came up to Sauer's car with the gun. *Id.*, p. 113, 1.16—p.115, 1.13. Sauer noticed that the gun was missing its clip and asked Luma for the clip. *Id.*, p. 115, 1.10–20. Then Sauer saw another person, later identified as Nesbitt, come out of the bushes near Luma's vehicle. *Id.*, p. 115, 1.18–22. Luma signaled to Nesbitt to come up the hill and Nesbitt drove up the hill in Luma's vehicle. *Id.*, p. 116, 1.1–4. Luma asked Nesbitt for the clip. *Id.* According to Sauer, Nesbitt then backed down the hill, got out of the car, went back in the bushes, pulled back up the hill, and gave Sauer the clip. *Id.*, p. 116, 1.7–25, p. 118, 1.14–24.

During the trial, Luma admitted to providing Sauer with the business card, Tr. V, p. 192, 1.2–15, offering to order girls for Sauer, *Id.*, p. 201, 1.7–20, and selling Sauer the gun and drugs. *Id.*, p. 155, 1.14–22, p. 219, 1.19–23. Luma testified that when Sauer wanted to delay the deal, he pressed Sauer to sell the gun right away. *Id.*, p. 214, 1.5–11.

Nesbitt testified that he had known Luma for about two and a half years. Tr., Mar. 20, 2001, p. 52, 1.9–11. Nesbitt stated that Luma picked him up on the morning of the sale. *Id.*, p. 87, 1.15–19. Nesbitt admitted that he was with Luma when Luma sold the gun to Sauer and that Sauer had questioned him about another firearm, "some Glock." *Id.*, p. 54, 1.24—p.55, 1.16. Nesbitt admitted to being on the driver's side of the vehicle, driving up the hill, and hearing Sauer ask for the clip. *Id.*, p. 67, 1.16–18; p.79, 1.12–p.80.1.2, p. 87, 1.2–5. Nesbitt admitted to backing down the hill. *Id.*, p. 80, 1.3–24.

## II. Counts I and II of the Indictment are Defective.

Count I of the Second Superseding Indictment (hereinafter "Indictment") charges:

On or about November 6, 1999, on St. Croix in the District of the Virgin Islands and elsewhere, the defendant, OWEN LUMA, did knowingly and intentionally, possess and receive a firearm, that being a Mach 11 semi-automatic pistol, which had the importer's or manufacturer's serial number removed, obliterated, and altered, and which had been shipped and transported in interstate and foreign commerce. In violation of Title 18, United States Code, Section 922(k).

Count II is identical, except reference is made to Troy Nesbitt, rather than Owen Luma.

■ Counts I and II are defective in that they fail to charge that Defendants knew that the Mac 11's serial number had been removed, obliterated and altered. Actual knowledge that the serial number had been tampered with is a necessary element of 18 U.S.C. § 922(k) at least since passage of the Firearms Owners' Protection Act, Pub.L. No. 99–308, § 104, 100 Stat. 456, 456 (1986), which modified the corresponding penalty provision, 18 U.S.C. § 924(a)(1)(B), to require knowing violation of section 922(k) for criminal sanctions to attach. At least the First, *United States v. Abernathy,* 83 F.3d 17, 19 (1st Cir.1996), Second, *United States v. Haynes,* 16 F.3d 29, 34 (2d Cir.1994), Fifth, *United States v. Hooker,* 997 F.2d 67, 72 (5th Cir.1993) and D.C., *United States v. Fennell,* 53 F.3d 1296, 1300–01 (D.C.Cir.1995), Circuits have held that for a defendant to be found guilty of violating this statute the jury must find that the defendant knew that the serial number of the gun that he or she possessed had been obliterated.

■ Neither Count I nor Count II includes a scienter element with regard to the obliterated serial number. Thus, although Counts I and II track the language of section 922(k), they are nonetheless deficient. It is not enough for the indictment to put the charge in the words of the statute unless the words of the statute "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (quoting *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1881)). Tracking the language of a statute is inadequate when the statute is silent on mens rea and criminal intent is an element of the crime. *United States v. Morrison,* 536 F.2d 286, 288–89 (9th Cir. 1976).

In one case in which scienter was implied in the indictment, the court found it sufficient that the prosecution proved scienter and that the jury was charged that finding the criminal intent was essential to conviction. *Tallman v. United States,* 465 F.2d 282, 286 (7th Cir.1972). Here, even if the term "knowingly and intentionally" which appears to apply only to the possession of the firearm could be inferred to also apply to the obliteration of the serial number, the jury verdict cannot be upheld because the jury was not charged that it must find that Defendants knew that the serial number was missing.

Because the omitted element was contested with regard to Luma and not supported by overwhelming evidence with regard to Luma or Nesbitt, the Court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. *See Neder v. United States,* 527 U.S. 1, 17, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). There was evidence that Luma did not know that the gun should have had a serial number. Tr. V, p. 149, 1.20—p.151, 1.19. Although Nesbitt testified at trial, he was never questioned concerning the serial number. The jury could only have found that Nesbitt knew

that the gun's serial number was missing if they agreed with the expert's opinion that the area where the serial number should have been had a different appearance as compared to the rest of the gun and also found beyond a reasonable doubt that Nesbitt had observed this difference. The Court does not find that there is overwhelming evidence of either. Thus, the omission of the scienter element was not harmless error. *Cf. United States v. Vazquez,* 271 F.3d 93, 103 (3d Cir.2001) (recognizing that "[t]rial errors resulting from a failure to submit an element of an offense to the jury are not structural defects, but instead, are subject to harmless or plain error analysis").

■■■ The basic principle "that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him" retains its full vitality under Rule 7(c) of the Federal Rules of Criminal Procedure. *Russell v. United States,* 369 U.S. 749, 765–66, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (quotation omitted). A defendant must be charged with every element of an offense. *United States v. Gaudin,* 515 U.S. 506, 509–510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). "When, as in this case, an indictment fails to allege all elements of an offense, the defect may be raised by the court *sua sponte." United States v. Spinner,* 180 F.3d 514, 516 (3d Cir.1999). "The inclusion of all elements ... derives from the Fifth Amendment, which requires that the grand jury have considered and found all elements to be present." *Id.* (quotation omitted). "Failure of an indictment sufficiently to state an offense is a fundamental defect ... and it can be raised at any time." *United States. v. Wander,* 601 F.2d 1251, 1259 (3d Cir.1979); *see also* Fed. R.Crim.P. 12(b)(2) (stating that failure of indictment to charge an offense "shall be noticed by the court at any time during the pendency of the proceedings").

The Indictment is defective in that in Counts I and II it charges Luma and Nesbitt, respectively, with possession of a firearm with a removed, obliterated, or altered serial number, but omits any scienter element with respect to the serial number. For the foregoing reasons, the Court dismisses Counts I and II of the indictment. .

## III. Nesbitt's Motion

Nesbitt argues that a new trial is required because (1) Luma's statements on the video and audio tapes explicitly or implicitly referring to him should not have been admitted on the basis of hearsay; (2) the videotapes, accompanied by transcripts, should not have been admitted because they were prejudicially confusing and misleading; and (3) the prosecutor asking a question that was not predicated in fact was unfairly prejudicial. Nesbitt also seeks a judgment of acquittal because he views the verdict as contrary to the weight of the evidence.

### A. A New Trial is Not Warranted because the Evidence was Properly Admitted and not Unfairly Prejudicial.

1. *Luma's Statements to Sauer Were Admissible Against Nesbitt*

Nesbitt argues that Luma's statements to Sauer concerning him captured on video and audio tape were improperly admitted because Defendants were not charged with a conspiracy and there was no independent evidence of a conspiracy. Nesbitt preserved this objection by raising it at trial. Tr. III, p. 55, 1.18—p.58, 1.9, p. 77, 1.17— p.79, 1.21, p. 83,1.3–25.

■■■ The Court properly admitted Luma's statements implicating Nesbitt. Rule 801(d)(2)(E) of the Federal Rules of Evidence allows admission of statements

of a co-conspirator even without a conspiracy charge. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir.1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). Statements of a co-conspirator are admissible when the court finds, by a preponderance of evidence, "that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (quotation omitted); *see also* Fed.R.Evid. 104(a) (stating that preliminary questions concerning the admissibility of evidence are to be determined by the court).

The following evidence of a conspiracy to sell a gun to Sauer was presented at trial: In addition to the recorded and videotaped conversations between Luma and Sauer explicitly and implicitly implicating Nesbitt,[1] Detective Christopher Howell reported that Luma identified Nesbitt as the individual that accompanied him when he sold the weapon to Sauer. Def. Luma's Ex. D, ¶ 5. According to Howell, Luma said that Nesbitt had been keeping the gun at his house and that when Luma picked up Nesbitt on the morning of the sale, Nesbitt had the gun with him. Def. Luma's Ex. D, ¶ 6. Nesbitt admitted that he was in and around Luma's vehicle when the sale occurred. Tr., Mar. 20, 2001, p. 54, 1.24—p.55, 1.16. p. 67, 1.16–18; p.79, 1.12—p.80, 1.24, p. 87, 1.2–19. Nesbitt testified that he heard Sauer ask for the clip and mention a "Glock." *Id.*, p. 67, 1.16–18; p.79, 1.12–p.80.1.2, p. 87, 1.2–5 Sauer stated that Nesbitt passed him the clip for the gun. Tr. III, p. 116, 1.7–25, p. 118, 1.14–24. Def Luma's Ex. F. Howell indicated that Luma said that he gave Nesbitt half the money from the sale of the gun. *Id.*

This evidence was sufficient for the Court to find by a preponderance of the evidence that there was a conspiracy between Luma and Nesbitt and that Luma's remarks were made in furtherance of that conspiracy. Thus, the Court did not err in admitting Luma's statements to Sauer that were adverse to Nesbitt.

### 2. The Video Tapes Did Not Prejudice, Confuse or Mislead the Jury.

Nesbitt contends that the use of the recorded conversation and transcripts to cross-examine Luma violated Fed.R.Evid. 403. According to Nesbitt, their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury.

Although Nesbitt quotes the cross-examination of Luma at length, Nesbitt fails to identify how such cross-examination unfairly prejudiced Nesbitt. Nesbitt knew sufficiently in advance of trial that the government was going to move for the admission of the audio and video tapes. Nesbitt could have predicted that if Luma testified, he would be cross-examined using the recordings. So there was no element of surprise.

▪ Because, as discussed above, the recordings were properly admitted, the government was free to use them as extrinsic evidence of prior inconsistent statements to impeach Luma pursuant to Fed. R.Evid. 613(b). The foundational prerequisites were present so that Nesbitt was not prejudiced in that Luma was afforded an opportunity to explain or deny his prior statements, and Nesbitt had the opportunity to interrogate Luma concerning his prior statements. *See id.* The government properly used the recordings to attempt to show that Luma's statements on the stand

---

1. *See Bourjaily*, 483 U.S. at 181, 107 S.Ct. 2775 (holding that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted").

were recent fabrications. Just because Luma's impeachment may have damaged Nesbitt's defense does not mean that Nesbitt was unfairly prejudiced. Nesbitt has not shown that using the videotapes to cross-examine Luma prejudiced, confused, or misled the jury or violated any other evidentiary rules.

3. *The Prosecutor's Question Referring to Nesbitt Keeping the Gun at his Home Was Not Unfair.*

Nesbitt accuses the prosecutor of misconduct in a footnote to his post-trial motion. The prosecutor questioned Luma as follows:

Q. So when you told the police the gun was at Mr. Nesbitt's house for about a week—

A. I never said that.

Tr. V, p. 207, 1.22–24. Nesbitt claims that the prosecutor had no good faith belief that the gun was at Nesbitt's house for a week and that therefore, the prosecutor's insinuation was unfairly prejudicial and constituted reversible error.

█ It is improper conduct for the prosecutor to ask a question which implies a factual predicate that is not supported by evidence in the trial record. *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir. 1990). Yet, there is evidence in this case that Luma told the police that Nesbitt had the gun at his house. Detective Howell wrote in his Report of Investigation which was admitted into evidence: "LUMA stated the [sic] prior to the sale NESBITT was keeping the Mach 11 at his home." Def. Luma's Ex. D, at 2. Furthermore, Luma implied in his conversations with Sauer, that Nesbitt was his source for the gun. Finally, the jury could infer from the fact that Luma picked up Nesbitt before meeting with Sauer to sell the gun that Nesbitt had the gun.

Because Nesbitt did not challenge the prosecution's question at trial, the Court

has no way of knowing whether the prosecution had a good faith belief concerning whether Luma told Howell the exact length of time that Nesbitt kept the gun at his house. There was evidence that Luma had told the police that Nesbitt had the gun at his home. Thus, the prosecution's questioning, which added nothing outside the record except the length of time that the gun was at Nesbitt's home, certainly did not raise to the level of plain error. *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (stating that plain error exception is to be used solely when a miscarriage of justice would otherwise result).

**B. The Jury Verdict Was Not Against the Weight of the Evidence.**

In considering Nesbitt's argument that there was insufficient evidence to support his conviction, the Court must view the evidence in the light most favorable to the government as the verdict winner. See *United States v. Obialo,* 23 F.3d 69, 71–72 (3d Cir.1994). If there was substantial evidence upon which a reasonable jury could have based its verdict, the Court must deny Nesbitt's motion for acquittal. *See id.* at 72.

█ Nesbitt states that there was no evidence other than the recorded conversations between Luma and Sauer that Nesbitt had anything whatsoever to do with the firearm. Nesbitt ignores his own admission that he was present during the gun transaction and heard Sauer demand the clip and ask about a Glock, and Sauer's testimony that Nesbitt handed him the clip for the gun. Nesbitt also fails to give any weight to Luma's statement to Detective Howell that Nesbitt had the gun.

Nesbitt argues that the jury should have placed more weight on his denial of participation and Luma's testimony exculpating

him than on Sauer's incriminating statements. However, the jury is charged with evaluating the credibility of the witnesses. The jury was free to give more weight to Sauer's testimony that Nesbitt gave him the clip than Nesbitt's and Luma's claims of innocence. Indeed, the Court so instructed the jury:

> The testimony of a single witness which produces in your mind the belief in the likelihood of a truth is sufficient for the proof of any fact, and would justify a verdict in accordance with such testimony, even though a number of witnesses may have testified to the contrary. If, after fully considering all of the evidence in the case, you hold a greater belief in the accuracy and in the honesty of that one witness, you can determine the truth by resolving the degree of credibility and reliability of the witnesses who have been produced before you. . . . . You may, in your sound judgment or discretion, accept all of the testimony of a witness as true, or reject it all as untrue, or credit it in part as true, or discredit it in part as untrue.

Tr., Mar. 20, 2001, p. 194, 1.14–25, p. 195, 1.6–10.

Moreover, Nesbitt has not shown that there was anything improper in the jury relying on the recorded conversations between Luma and Sauer to convict Nesbitt. From the recorded conversations in which Luma implied to Sauer that Nesbitt was the person from whom he intended to obtain the gun and the fact that Luma picked up Nesbitt just before the sale took place, the jury could reasonably infer that Nesbitt provided the gun to Luma. Thus, there was substantial evidence for a reasonable juror to have found beyond a reasonable doubt that Nesbitt was guilty of knowingly and intentionally possessing the gun that Luma sold to Sauer.

## IV. Luma's Motion

### A. Luma's Motion Was Untimely.

As the Government points out in its response to Luma's motion for judgment of acquittal or for a new trial, Luma's motion was not filed within seven days after the jury issued its verdict, as required under Federal Rules of Criminal Procedure 29(c) and 33. Unless the court grants an extension of time within the seven-day period, the court lacks the discretion to consider an untimely motion. *Carlisle v. United States*, 517 U.S. 416, 421, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996); *United States v. Gaydos*, 108 F.3d 505, 512 (3d Cir.1997). Luma failed to apply for an extension of time within the seven-day period. Although Nesbitt filed a timely motion for extension of time to file his post trial motions that motion was not joined by Luma within seven days of the verdict. Therefore, Nesbitt's motion does not inure to his benefit. *Cf. United States v. Morales*, 108 F.3d 1213, 1224 (10th Cir. 1997) (considering whether defendant's post trial motions were timely, notwithstanding codefendant having been granted extension of time).

Therefore, the Court must deny Luma's motion with respect to Count VII.

### B. Even if Luma's Motion Were Timely, It Would Be Denied.

Luma moves for a new trial or acquittal on Count VII of the Indictment which charges:

> On or about November 3, 1999, on St. Croix in the District of the Virgin Islands and elsewhere, the defendant OWEN LUMA, did knowingly and intentionally offer to take and transport on person to another person with knowledge and reasonable cause to know that the purpose of the taking and transporting was prostitution and lewdness and

assignation. In violation of Title 14 Virgin Islands Code Section 1622(6).

■ For the first time, at the hearing in this matter held on April 25, 2002, Luma asked the Court to find 14 V.I.C. § 1622(6) to be unconstitutionally vague. Luma argued in his brief that the Court erred in allowing the introduction of his confession to the police, permitting the jury to refer to transcripts of conversations between Luma and Sauer while they listened to recordings, and letting the prosecution show the jury an enhanced version of a videotape. Luma also contends that the Court should not uphold the jury's verdict because he was entrapped as a matter of law. Finally, Luma argues that there was insufficient evidence to support the verdict and that the Court lacked jurisdiction over this territorial charge.

1. *The Virgin Islands Law Prohibiting Prostitution is Not Unconstitutionally Vague as Applied.*

According to the historical notes included in the Virgin Islands Code, the Virgin Islands law prohibiting prostitution, 14 V.I.C. § 1622 "was patterned" on 11 Del. Code 1953, § 732 (Repealed). The Delaware statute was challenged in *State v. Chase,* 131 A.2d 178 (Del.Super.Ct.1957) and held to be unconstitutionally vague on its face and as applied.

■ This Court is not required to defer to the interpretation of the Superior Court of Delaware, particularly since the Delaware statute was not construed in *Chase* until after it was adopted by the Virgin Islands. *See Williams v. Dowling,* 318 F.2d 642, 643–44 (3d Cir.1963) (acknowledging that when Virgin Islands statute is based on law from another jurisdiction, Virgin Islands law should be interpreted consistently with construction given law by other jurisdiction *prior to* adoption in Virgin Islands). Rather, the Court must follow the Supreme Court's guidance

on vagueness challenges in deciding whether the Virgin Islands statute is unconstitutional:

> The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In other words, "[a] typical vagueness challenge ... can only be raised by a defendant whose own conduct arguably did not fall within the terms of the statute, thus allowing the defendant to claim that the lack of fair notice led to a deprivation of liberty without due process of law." *United States v. Loy,* 237 F.3d 251, 259 (3d Cir.2001).

Unlike the defendant in *Chase,* who was charged with indecent exposure, Luma's conduct falls well within the terms of 14 V.I.C. § 1622(6). Section 1622(6) subjects "[w]hoever—directs, takes or transports, or offers or agrees to take or transport, any person to any place, structure or building, or to any other person with knowledge or reasonable cause to know that the purpose of such directing, taking or transporting, is prostitution, lewdness or assignation" to a fine or imprisonment or both. The terms, "lewdness," "prostitution," and "assignation" are defined in 14 V.I.C. § 1621. The evidence indicates that Luma offered to bring Sauer women or to take Sauer to women for the purpose of assignation or prostitution. Section 1622(6) encompasses such conduct and gives fair notice that such conduct is prohibited.

**368**

2. *The Court Did Not Err in Admitting Luma's Confession or in Allowing the Jury to Refer to the Transcripts, or Admitting the Enhanced Videotapes.*

 Detective Howell testified that Luma was read his *Miranda* rights twice before he was questioned. Tr. I, p. 126, 1.2–10. He also indicated in his Report of Investigation that Luma was read his rights. Defendant Luma's Ex. D. ¶ 3. The Court found this evidence to be credible and therefore properly allowed admission of Luma's confession regarding offering prostitution.

 Moreover, at trial, Luma admitted to providing Sauer with one of his business cards that read "Shy Girls" and had a picture of a naked woman.[2] Tr. V, p. 138, 1.1–6, p. 192, 1.6—p.194, 1.1; Gov. Ex. 7. Luma arranged for Sauer to be given his card because he had heard that Sauer wanted "to go out and have a good time." *Id.*, p. 192, 1.2–15. Luma also testified that after Sauer received the card, Sauer came to where Luma worked and told him that he wanted "to have a good time" and that "he want to go and get some pussy," and that he told Sauer, "I going try." *Id.*, p. 140, 1.18–p.141, 1.1, p. 195, 1.25–p.196, 1.1. Finally, Luma acknowledged that he held the following conversation with Sauer:

A. There's how it came out. I said when you going to order some of my girls.

Q. And you also said to John, my girls got to get paid?

A. Yes.

Q. You said that to John. You also said to John that I charging my girls $200 each?

A. Yeah.

Q. You said that. And you also said to John that $200 each for my girls and take two of them man, you said that to John too, right?

A. He said he'd get two girls and he ain't care what the price for them. He'd pay $200. I throw that in his face to stop talking about guns.

*Id.*, p. 201, 1.7–20. Thus, Luma essentially admitted to the jury that he offered prostitution which would make any error in the admission of his confession upon questioning after his arrest harmless error. *See Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (holding that admission of involuntary confession is subject to harmless-error analysis); *United States v. Brink*, 39 F.3d 419, 424 n. 9 (3d Cir.1994) (applying harmless error rule in reviewing admission of confession); *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2nd Cir.1998) (finding admission of inculpatory pre-*Miranda* statements harmless error because statements were "brief and substantially the same" as later, admissible confession).

 Luma argues that the transcript and enhanced videotapes confused the jury. The Court disagrees. The transcript and enhancements tended to have the opposite effect. The transcripts, which were not admitted into evidence, helped the jury to understand the recorded conversations and the enhancements helped clarify the action and conversation captured on the videotape. The enhancements did not change the substance of the videotapes, but merely clarified the tapes. Tr. I, p. 148, 1.3—p.150, 1.24. Any confusion that the transcripts could have caused was cured by the Court's limiting instructions concerning the weight to give the transcripts which were repeated a number

---

2. Luma also admitted to selling the gun and drugs to Sauer. Tr. V, p. 155, 1.14–22, p. 219, 1.19–23.

of times throughout the trial. For example, the Court instructed:

> Ladies and gentlemen, you are going to hear a tape and you will also be given a written transcript. The transcript is to assist you. The transcript is not evidence. The transcripts will be taken away from you at the end of the recording. What is evidence is the recording itself.

> If there is any conflict as to what is in the transcript and what is in the tape, the evidence controls. That is the tape controls.

Tr. III, p. 108, 1.6–15.

3. *Defendant Has Failed to Show Entrapment as a Matter of Law.*

▉ "The question of entrapment is generally one for the jury, rather than for the court." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). In finding Luma guilty, the jury implicitly rejected Luma's defense that he was somehow entrapped. *United States v. Farley,* 760 F.Supp. 461, 463 (E.D.Pa. 1991).

▉ For a court to find "entrapment as a matter of law, the evidence must clearly show the government agent developed the criminal plan and that the defendant was not predisposed to commit the crime independent of the government's activities." *United States v. Kurkowski,* 281 F.3d 699, 701 (8th Cir.2002). Entrapment is established as a matter of law only when **"the evidence is undisputed** that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by the trickery, persuasion or fraud of the government." *United States v. Gambino,* 788 F.2d 938, 944 (3d Cir.1986) (emphasis added). "Evidence concerning predisposition is not undisputed if the determination depends upon the credibility of witnesses or the interpretation of the evidence." *Id.*

▉ Here, the evidence of predisposition and inducement was disputed. Luma had business cards printed before he met Sauer that appeared to concern prostitution. Luma testified on direct examination that he originated contact with Sauer by giving Sauer one of these business cards. Luma also indicated on cross-examination that he deliberately changed the conversation toward prostitution when speaking with Sauer. Tr. V, p. 199, 1.18–23, p. 237, 1.17–20.

Thus, although Luma presented evidence to the jury to show that he was entrapped, that evidence was disputed. Because the evidence concerning predisposition and inducement was disputed, the Court cannot find entrapment as a matter of law, and must uphold the jury's verdict.

4. *There Was Substantial Evidence to Support the Prostitution Charge.*

▉ Luma admitted to providing Sauer with one of his business cards. He also admitted asking Sauer when he would want one of his girls and gave Sauer a price of $200 each. This evidence was sufficient for the jury to find Luma guilty beyond a reasonable doubt of offering prostitution in violation of 14 V.I.C. § 1622(6).

5. *The Court Had Jurisdiction over the Prostitution Charge.*

The Court ruled in its Order dated May 23, 2001 that it had jurisdiction over Count VII of the indictment charging Luma with violation of 14 V.I.C. § 1622(6). Luma's motion for acquittal presents no new arguments warranting a change in the law of the case.

## V. CONCLUSION

For the foregoing reasons, Counts I and II of the indictment are dismissed. Defendants' Luma's and Nesbitt's motions for

acquittal or for a new trial are denied with respect to Counts VII and VI, respectively.

### ORDER

THIS MATTER comes before the Court on Defendants' motions for acquittal on all charges and for new trials. For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that

Counts I and II of the Indictment are **DISMISSED**, and

Defendants' motions on the remaining counts, Count VI and VII are **DENIED**.